UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

DOUGLAS DWAYNE NELSON, an individual,

      Plaintiff,

      v.

COLUMBIA COUNTY, a political subdivision of
the state of Oregon,

      Defendant.

Case No. 3:20-cv-01906-YY

FINDINGS AND
RECOMMENDATIONS

YOU, Magistrate Judge.

**FINDINGS**

On October 30, 2018, plaintiff Douglas Nelson was incarcerated at the Columbia County

Jail for an alleged probation violation. He was assigned to the top bunk in one of the jail's "A-

Pod" units. Like many other jails around Oregon, there is no ladder for inmates to use to climb in

or out of the top bunk. Plaintiff, who was 53 years old at the time, was familiar with this bunk

arrangement; he had been previously incarcerated at another state facility with the same setup,

and also had been assigned to a top bunk in Columbia County Jail's A-Pod at least one other

time during his previous four incarcerations there. Without a ladder, plaintiff usually climbed

down from the top bunk by facing out, away from the bed, and lowering himself onto a metal

desk that was attached to the wall next to the bed. On the morning of October 31, 2018, plaintiff

1 – FINDINGS AND RECOMMENDATIONS

slipped and fell while climbing down using the desk, hit a metal stool, and then landed on the floor. Although more details about the medical care plaintiff received are provided below, in short, plaintiff was in obvious pain and was examined by several nurses at the jail. When he was x-rayed on November 1, 2018, the results were negative for a hip fracture. Plaintiff was not examined by a physician while at the jail, nor did the medical staff refer plaintiff to a hospital for further examination. Over the next several days, plaintiff was still in pain and given Tylenol and ibuprofen. Although the parties point to some conflicting evidence about how intense plaintiff's pain appeared to be during this time, a video from November 8, 2018, shows he was still struggling to walk. That same day, plaintiff was released from the jail and went immediately to a hospital emergency room where, after additional imagining, he was diagnosed with a mildly displaced fracture of the right iliac wing of his hip.

Plaintiff brought this suit against the County and the medical care provider the County had contracted with, Correct Care Solutions, LLC ("Correct Care"). Plaintiff alleged two claims against the County and Correct Care for negligence in the form of medical malpractice and a 42 U.S.C. § 1983 *Monell* claim that defendants' policies, customs, and practices "amounted to deliberate indifference" to his due process rights under the Fourteenth Amendment. *See* Opp. 8-9, 37, 45, ECF 85. Plaintiff also alleged two claims against the County for negligence and premises liability in failing to initially assign him to a lower bunk given his age and failing to provide a ladder or some other dedicated means to climb into the top bunk. *Id.* at 8.

The County and Correct Care each filed motions for summary judgment. ECF 77, 79. Thereafter, Correct Care merged with Wellpath, LLC, and was terminated from this suit after

being discharged through a separate bankruptcy proceeding.[1] Thus, only the County's motion for summary judgment remains. ECF 79.[2] As explained in more detail below, there is a question of fact regarding the treatment plaintiff received at the jail, primarily based on competing expert testimony, and thus plaintiff's medical negligence claim is not subject to summary judgment. Plaintiff's other claims, however, fail as a matter of law. Plaintiff's state-law negligence claim regarding the design of the jail's bunk beds is not actionable under the doctrine of discretionary immunity, and plaintiff has failed to produce evidence sufficient to show that either his assignment to a top bunk or the County's Inmate Classification policy upon which that assignment was made created a foreseeable and unreasonable risk of harm. Finally, plaintiff's section 1983 *Monell* claim fails because, among other things, he has not shown that the medical service contract between the County and Correct Care caused a violation of his constitutional rights.

## I.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

---

[1] *See* Joint Status Report 1–2, ECF 101; Not. Discharge and Injunction 1–2, ECF 97; Correct Care Reply 3, ECF 88.

[2] The County's motion for summary judgment largely relies on Correct Care's arguments regarding the adequacy of medical care that plaintiff received. *See* Mot. Summ. J. 14, ECF 79 (expressly adopting and incorporating Correct Care's arguments regarding medical negligence). Thus, several references here are to Correct Care's summary judgment briefing, notwithstanding that Correct Care's motion is moot because it has been terminated from this case.

Once the moving party does so, the nonmoving party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324 (citing FED. R. CIV. P. 56(e)).

The court "does not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F.3d 1047, 1054 (9th Cir. 1999). "Reasonable doubts as to the existence of material factual issue are resolved against the moving parties and inferences are drawn in the light most favorable to the non-moving party." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000)

## II.    Medical Malpractice Claim

The County moves for summary judgment on plaintiff's third claim for relief, which asserts as a general matter that the County was negligent in providing medical care to plaintiff after his fall. Mot. Summ. J. 14–16, ECF 79; Second Am. Compl. ¶¶ 17–18, ECF 64. Establishing medical negligence or malpractice under Oregon law requires proof of: (1) a duty running from the defendant to the plaintiff; (2) breach of that duty; (3) resulting harm measurable in damage; and (4) a causal link between the breach and the harm. *Son v. Ashland Comm'y Healthcare Servs.*, 239 Or. App. 495, 506 (2010) (citation omitted). "When a physician-patient relationship exists, the doctor has a duty to exercise 'that degree of care, knowledge and skill ordinarily possessed and exercised by the average provider of that type of medical service.' " *Id.* (quoting *Curtis v. MRI Imaging Servs. II*, 327 Or. 9, 14 (1998)); *see also* O.R.S. 677.095 (providing that a doctor has a "duty to use that degree of care, skill and diligence that is used by ordinarily careful physicians in the same or similar circumstances in the community of the physician or a similar community").

Several preliminary or threshold matters regarding plaintiff's medical malpractice claim must be addressed before analyzing whether the evidence in the record is sufficient to satisfy elements of that claim. The County first asserts that plaintiff's medical negligence claim fails as a matter of law based on previous decisions from this District that have limited a plaintiff from bringing a "duplicative" negligence claim based on the same operative facts that gave rise to a section 1983 claim. *See* Mot. Summ. J. 14–15, ECF 79 (collecting District of Oregon cases). Those cases, however, largely address the overlap between section 1983 claims for excessive force or unlawful arrest under the Fourth Amendment and state law claims for negligence that were also based on the alleged "unreasonable risk of harm" related to the arrest or use of force. *See Shilo v. City of Portland*, No. 3:04-cv-00130-MO, 2005 WL 3157563, at *1 (D. Or. Nov. 22, 2005) (holding that the plaintiff could not sustain both a Fourth Amendment excessive force claim and a state law negligence claim based on the same factual allegations); *see also Johnson v. Tillamook Cnty.*, No. 3:15-cv-00125-PK, 2016 WL 11383939, at *11 (D. Or. Apr. 18, 2016) *report and recommendation adopted,* 2016 WL 3946919 (D. Or. July 20, 2016) (examining "*Shilo* and its progeny" and finding "[t]hose cases all involved § 1983 claims for use of excessive force").

In plaintiff's section 1983 *Monell* claim, he alleges that defendants instituted official customs, policies, and practices that amounted to deliberate indifference and violated his substantive due process rights under the Fourteenth Amendment. *See* Second Am. Compl. ¶¶ 19–23, ECF 64. Several decisions from this District have specifically held that a section 1983 claim based on deliberate indifference to medical needs under the Eighth Amendment is not duplicative of a state law claim for medical negligence because a deliberate indifference claim requires the plaintiff to show something beyond mere negligence. *See Johnson*, 2016 WL

5 – FINDINGS AND RECOMMENDATIONS

11383939 at *11 (finding the plaintiff's section 1983 claim was "based on deliberate indifference to medical needs, which [when brought under the Eighth Amendment] requires a showing of only subjective recklessness—not intent"); *Self v. Columbia Cnty.*, No. 3:20-cv-00584-BR, 2021 WL 2875659, at *15 (D. Or. July 8, 2021) ("[D]efendants have not established they are entitled to summary judgment on Plaintiff's negligence claim solely on the ground that it is premised on the same facts as his Eighth Amendment claim."); *Nordenstrom for Est. of Perry v. Corizon Health, Inc.*, No. 3:18-cv-01754-HZ, 2021 WL 2546275, at *19 (D. Or. June 18, 2021) (rejecting defendant's argument regarding duplicity of negligence and section 1983 claims because plaintiff's claim was "based on the Eighth Amendment, not the Fourth Amendment").

The parties dispute whether the Eighth Amendment or Fourteenth Amendment applies to plaintiff's section 1983 claim. *See* Second Am. Compl. ¶ 19, ECF 64 (asserting Fourteenth Amendment claim); Correct Care Reply 6, ECF 88 (asserting that the Eighth Amendment standard should apply). But even assuming, without deciding, that the Fourteenth Amendment applies as plaintiff contends, he would still have to show something beyond negligence to sustain any constitutional claim for deliberate indifference, as the County's own briefing implicitly recognizes. Mot. Summ. J. 17, ECF 79 ("A mere lack of due care does not suffice to establish a constitutional violation. A pretrial detainee must prove more than negligence but less than subjective intent—something akin to reckless disregard.") (citing *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018)) (internal citations omitted); *see also Powell v. Well Path Care*, No. 6:20-cv-01934-IM, 2022 WL 684835, at *5 (D. Or. Mar. 8, 2022), *aff'd,* No. 22-35242, 2022 WL 17760658 (9th Cir. Dec. 19, 2022) ("Medical malpractice alone is insufficient to state a [Section 1983] claim: a 'mere lack of due care by a state official' does not deprive a plaintiff of his rights under the Fourteenth Amendment.") (quoting *Castro v. Cnty. of Los*

6 – FINDINGS AND RECOMMENDATIONS

*Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016)); *see also* Correct Care Mot. Summ. J. 12, ECF 77 ("Before it can be said that a prisoner's civil rights have been abridged with regard to medical care, the indifference to his medical needs must be substantial. Mere indifference, negligence, or medical malpractice will not support this cause of action.") (quoting *Broughton v. Cutter Lab'ys*, 622 F.2d 458, 460 (9th Cir. 1980)) (simplified). Therefore, the County is not entitled to summary judgment on plaintiff's state law medical negligence claim based on its alleged "duplicity" with plaintiff's section 1983 constitutional claim alleging deliberate indifference.

The County also asserts as a basis for summary judgment that it "took reasonable and appropriate steps to obtain adequate medical care for its inmates housed at the Columbia County Jail . . . , by using [a public Request for Proposal] process, accepting a qualified bidder, and negotiating a contract for services." Mot. Summ. J. 15, ECF 79. The County further notes that "no County employee denied [p]laintiff any medical care," and asserts that jail staff's "reliance on Correct Care . . . medical personnel was reasonable and appropriate." *Id.* at 15–16. But the County does not explain the legal significance of these arguments or provide any authority for how they apply here. The County is "statutorily required to provide for the health and safety of the prisoners in their custody." *State v. K. J. B.*, 282 Or. App. 862, 867, *aff'd,* 362 Or. 777 (2018). And Oregon law is clear that "when the employer of the independent contractor is under a *statutory* duty to protect the safety of others, that statutory duty is nondelegable." *Cain v. Bovis Lend Lease, Inc.*, 817 F. Supp. 2d 1251, 1273 (D. Or. 2011) (emphasis in original) (citing *Johnson v. Salem Title Co.*, 246 Or. 409, 413–14 (1967). Thus, the County is not insulated from potential liability for the medical care plaintiff received while incarcerated at the jail simply because the County had contracted with Correct Care for those services.

7 – FINDINGS AND RECOMMENDATIONS

As for the County's arguments regarding the merits of plaintiff's medical malpractice claim, which primarily focus on the standard of care and causation elements, the analysis is straightforward. *See* Mot. Summ. J. 14, ECF 79; Correct Care Mot. Summ. J. 20–22, ECF 7. Plaintiff presents an expert report from Dr. Mark Baskerville, an Oregon-licensed medical doctor board certified in critical care and emergency medicine (among others), who opines that the care plaintiff received after he fell was below the standard of care.[3] After reviewing plaintiff's medical records, "body cam videos" that captured some of the interaction between plaintiff and jail medical staff and plaintiff's noticeable difficulty walking on November 8, 2018[4], and the deposition of one of the nurses who treated plaintiff and the radiologist who reviewed plaintiff's x-rays, Dr. Baskerville opined that the "evaluation by medical staff was cursory and inadequate," and the "imaging facilitated by the jail medical providers was inadequate."[5] In Dr. Baskerville's opinion, a CT scan should have been ordered either instead of or in addition to an x-ray, because a "pelvic X-ray . . . is inferior in diagnostic ability to the CT scan" and "[e]ven with negative plain radiographs, a patient who cannot bear weight – let alone ambulate – mandates a CT scan."[6] He also believes that the "treatment provided to [plaintiff] . . . was wholly inadequate" because jail medical staff did not provide plaintiff "crutches [or] satisfactory pain control,"[7] and he opined that further treatment and diagnosis was "delayed" given plaintiff's continued reports of pain and inability to ambulate.[8] Finally, Dr. Baskerville opined that it "was very likely that by

---

[3] Weingart Decl., Ex. O ("Baskerville Report") at 1, ECF 85-15.
[4] *See* Weingart Decl., Ex. R(b) at 1:12, ECF 85-18 (conventionally filed exhibit with body camera footage).
[5] Baskerville Report 2, 4, ECF 85-15.
[6] *Id.* at 2, 3.
[7] *Id.* at 3.
[8] *Id.*

making [plaintiff] hobble around on an obviously injured leg/hip for days only aggravated the injury."[9]

The County points to a report from another of plaintiff's medical experts, Dr. Justin Roth, who opined that "[i]t is very reasonable to observe an injury such as this with serial imaging (ie follow-up x-rays looking for displacement/callus in 1-2 weeks if pain persists)."[10] Correct Care Mot. Summ. J. 17–18, ECF 77. The County contends that is "precisely what occurred" here; plaintiff had an x-ray on November 1, 2018, that was negative for a fracture and then, when his pain did not subside, he received follow-up imaging a week later (albeit at an outside hospital that plaintiff went to on his own after being released from the jail) on November 8, 2018, which revealed the fracture. *Id.* at 18. But the conflicting opinions from Dr. Baskerville and Dr. Roth regarding the standard of care and causation have, at minimum, created a question of fact on plaintiff's medical malpractice claim.[11]

In an effort to foreclose this rather patent question of fact, the County attacks the admissibility of Dr. Baskerville's opinion. First, the County asserts that Dr. Baskerville is not an expert in "correctional care" and thus cannot provide a competent opinion about "the highly specialized arena of correctional healthcare." Correct Care Mot. Summ. J. 19, ECF 77; *see also* Correct Care Reply 13–14, ECF 88. But that issue goes to the weight of Dr. Baskerville's testimony, not its admissibility. *Est. of Wilson by & through Jackson v. Cnty. of San Diego*, No. 3:20-cv-00457-RBM-DEB, 2023 WL 8360011, at *4 (S.D. Cal. Dec. 1, 2023) ("[T]he Court is

---

[9] *Id.*

[10] Taylor Decl., Ex. 11 ("Roth Report") at 3, ECF 78-11.

[11] Because the competing expert opinions are sufficient to create an issue of fact on plaintiff's medical malpractice claim, it is not necessary to provide an exhaustive and detailed account of the care plaintiff received, or the parties' competing interpretations of the facts in the record. *See* Correct Care Mot. Summ. J. 2–8, ECF 77; Mot. Summ. J. 1–6, ECF 79; Opp. 3–8, ECF 85.

9 – FINDINGS AND RECOMMENDATIONS

not convinced that correctional providers are held to a different standard of care.") (citation omitted); *Simms-Belaire v. Washington Cnty.*, No. 3:20-cv-338-SI, 2024 WL 279020, at *6 (D. Or. Jan. 25, 2024) (finding that expert was "generally qualified to opine as to issues of Plaintiff's care" and "her lack of specific experience in, or familiarity with, providing care in correctional settings goes to the weight of her testimony, not to its admissibility"); *Santos v. NaphCare, Inc.*, No. 3:21-cv-00131-YY, 2024 WL 4694006, at *18 (D. Or. July 9, 2024), *report and recommendation adopted*, 2024 WL 4542228 (D. Or. Oct. 21, 2024) (rejecting argument that doctor was not "qualified to opine as to the standard of care for providers working in correctional settings" because that was an issue of "the weight of [the doctor's] opinion, not its admissibility").

For similar reasons, the County's assertion that Dr. Baskerville's opinion is inadmissible because he is a physician and thus not qualified to opine on the standard of care applicable to the various nurses who provided plaintiff's medical care is unavailing. *See* Correct Care Reply J. 15, ECF 88.[12] Dr. Baskerville is board certified in critical care and emergency medicine, in addition to other areas. Thus, he is qualified to opine on the reasonable practices in the medical community for diagnosing and treating hip fractures including whether a physician should have been involved in providing care to plaintiff after his fall. *See Wesley v. Gulick*, No. 3:15-cv-440-SB, 2017 WL 4881580, at *4 (D. Or. Oct. 30, 2017) (finding physician was qualified "to give an opinion on the reasonable practices in the medical community for catheter insertion" and physician's testimony was "sufficient to raise a genuine question as to whether a reasonable nurse should have known that there was a problem with the catheter insertion").

---

[12] The County also incorporated and adopted the arguments Correct Care made in its Reply In Support of Summary Judgment. *See* County Reply 8, ECF 87.

In sum, because there is a question of fact as to whether the medical care plaintiff received met the standard of care and caused plaintiff's injury, the County is not entitled to summary judgment on plaintiff's medical malpractice claim.

### III.    Premises Liability

Plaintiff's first claim for relief asserts that the County was negligent in the following ways: (1) "In failing to provide a safe means for climbing onto and off of the top sleeping bunk, thereby creating an unreasonably dangerous and reasonably foreseeable hazard to Plaintiff;" (2) "In failing to assign Plaintiff to the bottom bunk during the classification process, given the County's awareness of Plaintiff's advanced age;" and (3) "In failing to have detailed standards regarding how the jail is to use age as a factor in bunk assignments." Second Am. Compl. ¶¶ 14a–14c, ECF 64. Plaintiff's second claim for relief similarly alleges a "premises liability" claim against the County for "fail[ing] to maintain safe premises for inmates" by "[m]aintaining a bunk bed without a safe means for climbing onto and off of the top sleeping bunk, thereby creating an unreasonably dangerous and reasonably foreseeable hazard to plaintiff." *Id.* ¶ 16. At the hearing on the motion, plaintiff's counsel confirmed that the first category of negligence and the second claim for premises liability were actually duplicative, and agreed to strike from the complaint paragraph 14a and pursue this theory of liability through a "premises liability" framework. *See also* Opp. 29, ECF 85.

The County first argues that it is entitled to summary judgment on plaintiff's premises liability claim on the basis of "discretionary immunity." Mot. Summ. J. 7–9, ECF 79. Under Oregon law, as a general matter, public bodies "are liable for the torts of their employees and agents." *Verardo v. Oregon Dep't of Transportation*, 319 Or. App. 442, 446 (2022) (citing O.R.S. 20.265(1)). One exception to this rule is "discretionary immunity or 'discretionary-

function' immunity," which is codified at O.R.S. 30.265(6). *Id.* (citing *Turner v. State of Oregon*, 359 Or. 644, 652 (2016)). That statute provides, in part:

> Every public body and its officers, employees and agents acting within the scope of their employment or duties . . . are immune from liability for: . . . (c) Any claim based upon the performance of or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused.

O.R.S. 30.265(6). Discretionary immunity requires three elements: "[t]he decision must be the result of a choice involving the exercise of judgment; the decision must involve public policy as opposed to the routine day-to-day decision-making of public officials; and the decision must be exercised by a body or person that has the responsibility or authority to make it." *Maney v. Oregon*, No. 6:20-cv-00570-SB, 2024 WL 2288807, at \*60 (D. Or. Apr. 10, 2024) (quoting *Verardo*, 319 Or. App. at 447).

The County asserts that its alleged failure to provide "a safe means for climbing onto and off the top bunk" was a discretionary decision that is immune from liability under O.R.S. 30.265(6). Mot. Summ. J. 7, ECF 79. The County traces the decision back to late 2016, when the then-County Sheriff delegated authority to Jail Captain Tony Weaver to "make [a] decision about whether the 'A-Pod' should be remodeled."[13] Weaver apparently discussed with the Jail Lieutenant and Administrative First Sergeant "potentially redesigning 'A-Pod' so as to either increase the number of cells or to increase bunk capacity within the unit, given the existing needs of the jail."[14] As the discussions were ongoing, "an inmate housed in 'A-Pod' committed suicide by hanging in December of 2016."[15] The remodeling discussions then "included concerns as to whether any remodel would create increased ligature points within the housing units, which was

---

[13] Pixley Decl. ¶¶ 3–4, ECF 80.
[14] *Id.* ¶ 7.
[15] *Id.* ¶ 8.

12 – FINDINGS AND RECOMMENDATIONS

something [they] strenuously wanted to avoid, particularly in light of the recent suicide."[16] The conversations moved to whether any changes to the A-Pod housing units could be made "that would not create any additional ligature points within the housing units and still stay within the County's budget for the jail remodel project."[17] "Ultimately, a determination was made that the County could not remodel 'A-Pod', due to the increased cost involved and risk the of creating additional ligature points in the A-Pod housing units which are intended for at risk inmates or inmates whose risk factors have yet to be determined."[18]

The decision whether to remodel A-Pod to provide a ladder or some other way to climb into the top bunk in a jail cell is precisely the kind of decision that depends on the assessment of numerous policy factors, such as inmate safety, jail security, and economic considerations that discretionary immunity was designed to protect from judicial oversight. *See McBride v. Magnuson*, 282 Or. 433, 437 (1978) ("[I]nsofar as an official action involves both the determination of facts and simple cause-and-effect relationships and also the assessment of costs and benefits, the evaluation of relative effectiveness and risks, and a choice among competing goals and priorities, an official has 'discretion' to the extent that he has been delegated responsibility for the latter kind of value judgment."); *Turner*, 359 Or. at 653 (explaining that discretionary immunity is based on separation of powers principles dictating that when a governmental actor makes a decision "committed to authority of that particular branch of government that are based on assessments of policy factors, such as the social, political, financial, or economic effects of implementing a particular plan or of taking no action . . . the

---

[16] *Id.* ¶ 9.
[17] *Id.* ¶ 10.
[18] *Id.* ¶ 11 (missing internal quotation marks in original).

13 – FINDINGS AND RECOMMENDATIONS

courts should not, without clear authorization, decide whether the proper policy has been adopted or whether a given course of action will be effective in furthering that policy").

Although there does not appear to be an Oregon case on point, numerous courts from around the country have ruled that "the failure of [federal Bureau of Prisons] officials to provide ladders on prison bunk beds" is not actionable under a similar "discretionary immunity" provision of the Federal Tort Claims Act ("FTCA"). *Preston v. United States*, No. 1:08-cv-02493-CAM, 2010 WL 2975631, at *3 (N.D. Ga. July 27, 2010); *see also Bultema v. United States*, 359 F.3d 379, 384 (6th Cir. 2004) ("The district court . . . reasoned properly that . . . [the] claim that the bunk beds should have had ladders and/or guardrails . . . is a discretionary call to be made by prison administrators. There were valid safety and security concerns relating to the beds at issue. Guard rails, and sometimes ladders, are not included because of the danger that they can be broken off and used as weapons or escape devices."); *Manning v. Flock*, No. 1:11-cv-00293, 2012 WL 1078227, at *16 (M.D. Pa. Mar. 30, 2012) ("The decision not to provide ladders for upper bunk access involves policy choices, which the Third Circuit has cautioned that federal courts 'should not second guess.' ") (quoting *Mitchell v. United States,* 225 F.3d 361, 364 (3d Cir. 2000)); *see also Paulino-Duarte v. United States*, No. 1:02-cv-09499-RCC, 2003 WL 22533401, at *2 (S.D.N.Y. Nov. 7, 2003) (finding "[t]he decision as to whether to put guardrails on bunk beds or deciding which inmates get which bunks is clearly discretionary" and therefore subject to immunity under the FTCA). These decisions are persuasive given that Oregon's discretionary immunity statute is based on, and is in fact practically identical to, the federal version, and the rationales underlying the two are the same. *See* 28 U.S.C. ¶ 2680(a) (providing that the FTCA's waiver of sovereign immunity does not apply to "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on

14 – FINDINGS AND RECOMMENDATIONS

the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused"); *Smith v. Cooper*, 256 Or. 485, 500–01 (1970) (analyzing federal cases interpreting discretionary immunity under FTCA in applying same principle under Oregon law); *Blanco Ayala v. United States*, 982 F.3d 209, 214 (4th Cir. 2020) (explaining that the discretionary immunity exception to the FTCA "protects that 'discretion of the executive . . . to act according to [his] judgment of the best course, a concept of substantial historical ancestry in American law' ") (quoting *Dalehite v. United States*, 346 U.S. 15, 34 (1953)).

The Oregon legislature has directed each county to "provide, keep and maintain . . . a local correctional facility" and further that each local correctional facility "shall . . . ensure that the facility be clean, and provide each confined detainee or prisoner . . . mattress and blankets that are clean and fire retardant." O.R.S. 169.030(1); O.R.S. 169.076(8). But there is no mandatory duty to provide ladders for bunks or any other dictate by which each county must otherwise fulfill these statutory directives. *See Calderon v. United States*, 123 F.3d 947, 950 (7th Cir. 1997) (explaining that federal regulations requiring the Bureau of Prisons to "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States" did not "direct the manner by which the BOP must fulfill this duty" and thus BOP had discretionary immunity in determining whether to sanction inmates); *Francis v. United States*, No. 3:10-cv-01474-AWT, 2011 WL 3563146, at *6 (D. Conn. Aug. 12, 2011) (ruling that discretionary immunity applied to the "decision as to whether to provide ladders on bunk beds" because, among other things, it was "a matter of safety, involves discretion and is not specifically provided for by statute").

Therefore, plaintiff's premises liability claim (and, concomitantly, his first alleged theory of negligence) challenging the decision to provide inmates at the jail with ladderless bunks, *see*

15 – FINDINGS AND RECOMMENDATIONS

Second Am. Compl. ¶¶ 14a, 15–16, ECF 64, is subject to summary judgment based on discretionary immunity. It is not necessary then to reach the parties' other arguments regarding the merits of this claim. *See* Mot. Summ. J 12–14, ECF 79; Opp. 30–31, 36–37, ECF 85.

## IV.    Other Negligence Theories

Plaintiff asserts that the County was negligent in "failing to assign Plaintiff to the bottom bunk during the classification process, given the County's awareness of Plaintiff's advanced age" and in "failing to have detailed standards regarding how the jail is to use age as a factor in bunk assignments." Second Am. Compl. ¶¶ 14b–c, ECF 64; *see also* Mot. Summ. J. 9–12, ECF 79. "To prevail on a negligence claim under Oregon law, the plaintiff must show 'the defendant's conduct created a foreseeable and unreasonable risk of legally cognizable harm to the plaintiff and that the conduct in fact caused that kind of harm to the plaintiff.' " *Hanington v. Multnomah Cnty.*, 593 F. Supp. 3d 1022, 1044 (D. Or. 2022) (quoting *Chapman v. Mayfield*, 358 Or. 196, 205 (2015)) (simplified).[19]

Both of plaintiff's theories are subject to summary judgment. For one, it is undisputed that the jail's "Inmate Classification" policies that are used to determine the "appropriate housing" assignment for an inmate require an evaluation of a host of factors that specifically includes an inmate's age, and many others such as medical care needs, prior history, current

---

[19] This standard of "general foreseeability" applies here, despite some apparent confusion in the briefing. *See* Opp. 30, ECF 85 (asserting that "[t]his case . . . does not involve a general foreseeability" and instead should be evaluated based on "the special relationship between [plaintiff] and the County is his status as an invitee to the jail"). While it is true that many cases from this district have recognized that there is a special relationship between "inmates and their jailors," *Hanington*, 593 F. Supp. 3d at 1044 (citing *Nordenstrom*, 2021 WL 2546275 at *20), those case have by-and-large applied a general foreseeability framework to inmate claims for non-medical negligence. *See, e.g.*, *Crane v. United States*, No. 3:10-cv-00068-AC, 2013 WL 1453166, at *5 (D. Or. Mar. 21, 2013), *report and recommendation adopted,* 2013 WL 1437816 (D. Or. Apr. 9, 2013); *Maney*, 2024 WL 2288807 at *41 (following *Crane*).

charges, history of violence or an increased susceptibility to violence, to name a few.[20] It is also undisputed that the jail's "Inmate Management" policies in place at the time of plaintiff's incarceration, which include those "related to classification of inmates, non-disciplinary restrictions, inmate rules, inmate behavior and discipline, and inmate grievances" were subject to an inspection by the Oregon State Sheriff's Association in 2017 and were deemed to be in compliance with Oregon jail standards.[21] *See* Mot. Summ. J. 12, ECF 79.

Plaintiff's expert, Phil Stanley, who among things, formerly served as a Superintendent of three prisons within the Washington Department of Corrections, examined the jail's Inmate Classification policy and opined that he did "not believe that [plaintiff's] age was considered" in assigning him to an upper bunk.[22] But Stanley offers no evidence, analysis, or data to support his belief that the County did not consider plaintiff's age in determining his housing assignment under the Inmate Classification policy, which explicitly provided that age was one relevant factor among many. This bare speculation is not sufficient to create a question of fact as to whether the County failed to consider plaintiff's age in assigning him to the top bunk, or that the policy itself somehow created an unreasonable risk of foreseeable harm. *See Brown v. Lane Cnty.*, No. 6:21-cv-01866-AA, 2024 WL 1075274, at *4 (D. Or. Mar. 12, 2024) ("[A]n expert's opinion must rest on 'facts or data in the case that the expert has been made aware of or personally observed,' not merely assumptions and speculation.") (quoting FED. R. EVID. 703) (additional citations omitted); *Hanington*, 593 F. Supp. 3d at 1044 (finding the defendant's inmate classification procedure was not negligent despite expert's opinion that the procedure was not properly

---

[20] Weingart Decl., Ex. X at 1, 4–6, ECF 85-24.

[21] Pixley Decl. ¶¶ 14–16, ECF 80; *see also id.*, Ex. 3 at 1–2, ECF 80-3 (letter from OSAA regarding 2017 inspection).

[22] Weingart Decl., Ex. P ("Stanley Report") 6, ECF 85-16; *see also* Opp. 36, ECF 85.

17 – FINDINGS AND RECOMMENDATIONS

followed); *see also Malone v. Potter*, No. 2:07-cv-05530-MMM-FFM, 2009 WL 10672523, at *4 (C.D. Cal. Feb. 25, 2009) (finding that expert testimony "regarding defendant's alleged failure to follow its employment policies" was not reliable because the expert did "not explain the basis upon which he concludes that defendant's alleged actions violated its policies; he merely assert[ed] that the actions were contrary to defendant's policies"). If anything, Stanley's report confirms that the County's Inmate Classification policy is a reasonable one; along with his own experience that "the decision to place an inmate in an upper bunk considers the inmate's age," he cites numerous sources listing age as a criteria for the inmate classification, including the "Oregon State Jail Standards" and the "American Correctional Association standard on Inmate Housing."[23] Thus, plaintiff has failed to create an issue of fact on the theory that the County was negligent in "failing to have detailed standards regarding how the jail is to use age as a factor in bunk assignments." Second Am. Compl. ¶ 14c, ECF 64

Nor has plaintiff established a question of fact as to whether the County was negligent in failing to assign him to a lower bunk given his age. *See id.* ¶ 14b. Plaintiff was 53 at the time of the incident but he does not explain how age alone gives rise to a foreseeable risk of harm in being assigned to a top bunk. It is undisputed that when plaintiff was booked into the jail, he did not report any medical issues or injuries that might have put the County on notice of a risk of harm in assigning him to the top bunk, and he did not request a bottom bunk or any other accommodation.[24] Plaintiff had been previously incarcerated in the jail's A-Block, including at least one past assignment to an upper bunk, and he specifically denied having any prior issues getting up and down, noting in particular that he was "in pretty good shape" for his age.[25]

---

[23] *Id.* at 5–6.
[24] *See* Nweze Decl., Ex. 7 at 1–2, ECF 81-7.
[25] Nweze Decl., Ex. 5 (Nelson Dep.) 80:21–13; 82:2–10, ECF 81-5.

18 – FINDINGS AND RECOMMENDATIONS

Plaintiff has not produced any evidence of other falls, and he admitted that he had climbed down from an upper bunk in the same manner he used here "a hundred times" without issue during other periods of incarceration at different facilities with similar bunk layouts.[26] Plaintiff asserts that deputies at the jail were aware that inmates would use the metal desk attached the wall to climb in and out of bed. But even if that is true, it does not establish that using this method, just as plaintiff had done "a hundred times" before he fell, created an unreasonable risk of harm. *See* Opp. 32, ECF 85. Nor does Stanley's opinion create an issue of fact on this point. Stanley states that it is "well understood" in his experience that "an inmate who is over 50 years old is considered elderly"[27] and then opines that "[a]n inmate older than 50 years old should be placed in a bottom bunk of a two person cell."[28] But again Stanley does not explain or cite any evidence to support why the arbitrary age of 50 should be the determining factor in assigning an inmate to a bottom bunk as a matter of course. As described above, the County's Inmate Classification policy takes many factors into account, including an inmate's age, health and medical conditions, demeanor, special needs, and more, when determining housing and bunk assignments.[29] There is no evidence in the record to support the conclusion that the County acted unreasonably in assigning plaintiff to a top bunk in light of all the relevant classification factors.

For these reasons, plaintiff's claim that the County was negligent in either failing to have more "detailed standards" for how age was to be considered in its Inmate Classification policy or in how the County applied its Inmate Classification policy to plaintiff here, is subject to summary judgment.

---

[26] Nelson Dep. 87:3–8, ECF 81-5.
[27] Stanley Report 5, ECF 85-16.
[28] *Id.* at 6.
[29] Weingart Decl., Ex. X at 1, 4–6, ECF 85-24.

## V.    Section 1983 *Monell* Claim

The County also moves for summary judgment on plaintiff's fourth claim for relief, which asserts a section 1983 claim for violation of plaintiff's due process rights under the Fourteenth Amendment. Mot. Summ. J. 16–21, ECF 79; *see also* Second Am. Compl. ¶ 19–22, ECF 64.[30] To establish a section 1983 claim, plaintiff must show he was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999). "While local governments may be sued under § 1983, they cannot be held vicariously liable for their employees' constitutional violations." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690, 694 (1978)). Instead, a local government "may only be held liable under § 1983 'if the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation.' " *Karthauser v. Columbia 9-1-1 Commc'ns Dist.*, 647 F. Supp. 3d 992, 1023 (D. Or. 2022) (quoting *Connick v. Thompson*, 563 U.S. 51, 60 (2011)). "Therefore, persons who seek to hold a local government liable under § 1983 must show that 'action pursuant to official municipal policy caused their injury.' " *Id.* (quoting *Connick*, 563 U.S. at 60); *see also United States v. Cnty. of Maricopa, Arizona*, 889 F.3d 648, 652 (9th Cir. 2018)

---

[30] As mentioned above, there is some dispute as to whether the Eighth or Fourteenth Amendment applies to plaintiff's constitutional claim because he was incarcerated for a parole violation. There is a split in authority as to whether the Eighth Amendment, which applies to prisoners, or the Fourteenth Amendment, which applies to pretrial detainees, is the proper source of rights in such a situation. *See Castro*, 833 F.3d at 1067–68; *Est. of Wilson by & through Jackson v. Cnty. of San Diego*, No. 3:20-cv-0457-RBM-DEB, 2022 WL 789127, at *14 (S.D. Cal. Mar. 14, 2022) (applying Eighth Amendment); *Hanington*, 593 F. Supp. 3d at 1032–33 (applying Fourteenth Amendment). The analysis that follows here assumes, without deciding, that the more expansive Fourteenth Amendment standard applies because even under that standard, as will be explained, plaintiff's claim fails as a matter of law.

(explaining that the " 'official policy' requirement is intended to ensure that a municipality's liability 'is limited to acts that are, properly speaking, acts of the municipality—that is, acts which the municipality has officially sanctioned or ordered' ") (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)) (simplified).

For purposes of *Monell* liability, a "policy" can be based on "(1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker." *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019). A "policy" is a "deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Fogel v. Collins*, 531 F.3d 824, 834 (9th Cir. 2008). A "custom" is a "widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a custom or usage with the force of law." *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); *Los Angeles Police Protective League v. Gates*, 907 F.2d 879, 890 (9th Cir. 1990).

A plaintiff must show that the policy or custom "was the moving force behind the constitutional violation." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013) (simplified). "To meet this requirement, the plaintiff must show both causation-in-fact and proximate causation." *Id.* (simplified). "In the context of *Monell* liability, a plaintiff can meet this burden by 'establish[ing] that the injury would have been avoided had proper policies been implemented.' " *Simms-Belaire*, 2024 WL 279020 at *15 (quoting *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1190 (9th Cir. 2006)).

Plaintiff asserts the following alleged policies or customs as the basis for his *Monell* claim against the County:

21 – FINDINGS AND RECOMMENDATIONS

- Failing to have inmates with emergency medical conditions seen in person by physicians;
- Failing to staff the Columbia County Jail with a physician, on site, at any regular interval;
- Failing to have inmates with emergency medical conditions, like plaintiff, transported outside of the Columbia County Jail for medical treatment; and
- Failing to have inmates with emergency medical conditions, like plaintiff, seen in person by supervising medical staff.

Opp. 38, ECF 85; *see also* Second Am. Compl. ¶ 22, ECF 64. Generally, these alleged policies or customs can be grouped into two categories: (1) medical staffing at the jail, and (2) treatment of inmates with emergency medical conditions.

Regarding the first category, the County does not contest that the medical staffing at the jail was provided pursuant to a contract between the County and Correct Care, and that this constitutes a "policy" for purposes of plaintiff's *Monell* claim. *See* Correct Care Mot. Summ. J. 13, ECF 77 (acknowledging that the "services contract provides what it provides and . . . to the extent these contractual terms constitute a 'policy,' it is the only *Monell* factor Plaintiff can satisfy"); Mot. Summ. J. 18, ECF 79 (expressly adopting and incorporating Correct Care's "arguments regarding [plaintiff's *Monell*] claim"). Correct Care's briefing describes how the contract between the County and Correct Care came to be and its relevant terms:

> In 2015, Columbia County issued a Request for Proposal for a medical services provider at the Columbia County Jail. The County was seeking a contractor for the Jail, which was funded to have a capacity of only 135-185 inmates at any given time. This Contract was awarded to [Correct Care], and that agreement was subsequently amended and extended. During the time of the events described below, [Correct Care] staffing was defined by that Contract, and included four hours a week of an on-site Nurse Practitioner, supplemented by 24/7 on call physician or nurse practitioner coverage.

22 – FINDINGS AND RECOMMENDATIONS

Correct Care Mot. Summ. J. 2, ECF 77 (internal citations omitted).[31] Neither plaintiff nor the County dispute that this is an accurate description of the terms of the contract between Correct Care and the County for how medical staffing at the jail was provided at the relevant time. And it is undisputed that plaintiff was not examined in person by a medical doctor while receiving medical treatment at the jail. At the time of plaintiff's injury, "the on-site provider was Doctor of Nursing Practice, Nancy Ronan," and "the on-call provider was Family Nurse Practitioner, Jennifer Armstrong." *Id.* It is undisputed that plaintiff was examined by several different registered nurses on October 31 and November 1, 2018.[32] On November 1, 2018, the on-call nurse practitioner ordered an x-ray for plaintiff, and a mobile service came to the jail to perform the imaging.[33] The next day, DNP Ronan reviewed plaintiff's x-ray results; according to the report from an external radiologist accompanying plaintiff's imaging, "[n]o fracture or subluxation [was] seen[.]"[34] Plaintiff subsequently made additional requests for medical services, and was given "Tylenol and Ibuprofen" during "med pass" between November 2 and 6, 2018. Opp. 7, ECF 85. Then, plaintiff was released from the jail on November 8, 2018, and diagnosed with a hip fracture after visiting a hospital emergency room. *Id.* at 7–8.

It must be remembered, however, that plaintiff's theory of liability for his *Monell* claim is not that the course of treatment he received was constitutionally inadequate; rather, it is that "the failure to diagnose [plaintiff's] hip fracture was the result of the contract between Correct Care and Columbia County." Opp. 42, ECF 85; *see also id.* at 41 ("It should be noted that in the context of the §1983 claim, plaintiff's injury is not the hip fracture itself, but the policy driven

---

[31] *See also* Taylor Decl., Ex. 1 at 3; *id.*, Ex. 2 at 4, ECF 78-2.
[32] *See, e.g.*, Weingart Decl., Ex. F at 1, ECF 85-6.
[33] Weingart Decl., Ex. J (Brown Dep.) 38:16–39:9, ECF 85-10; *see also id.*, Ex. F at 1, ECF 85-6.
[34] *Id.*, Ex. F at 8, ECF 86-6.

23 – FINDINGS AND RECOMMENDATIONS

failure to diagnose and treat Plaintiff's hip fracture, which caused Plaintiff further pain and suffering."). Plaintiff's argument fluctuates somewhat. On the one hand, plaintiff seems to argue that the contractual terms themselves did not provide for physician oversight and it was this policy that violated plaintiff's constitutional rights. *Id.* at. 38 ("It is clear that Columbia County and Correct Care contracted with each other to staff the jail without any time at all for a physician to be present at any regular interval."). At other times, plaintiff seems to argue that the contract suggested that physician oversight was available, but the County is liable for not actually utilizing direct physician oversight in providing care at the jail as a matter of custom or practice. *See id.* (noting "[t]he contract states that the contractor will provide all supervision of staff through a primary physician assigned to manage staff at the Jail"); *see also id*. at 39 ("Plaintiff's evidence shows that Columbia County and Correct Care Solutions, as a custom and policy, provided zero physician supervision the provision of health care to the inmates of the Columbia County Jail, at the time of [plaintiff's] incarceration.").

Under either theory, plaintiff's claim of *Monell* liability is subject to summary judgment for several reasons.[35] For one, if the contract did provide for physician oversight or consultation but the medical staff who treated plaintiff did not utilize it in this instance, then it was not the contractual policy itself that caused plaintiff's injury but the decisions made by the staff. Opp. 39, ECF 85 ("Correct Care's proposed contract to Columbia County certainly makes it *seem* like there would be physician available for Columbia County[.]") (emphasis in original); *see Est. of*

---

[35] To the extent plaintiff's theory regarding medical staffing could be framed as based on a "custom" of not utilizing direct physician supervision or "diagnosing fractures on-site," *see* Opp. 40, ECF 85, plaintiff has not produced evidence of other incidents sufficient to demonstrate that such customs or practices were so widespread as to be the "standard operating procedure" of the jail. Additional analysis regarding the evidence required to establish a "custom or practice" is provided below.

*Hill by & through Grube v. NaphCare, Inc.*, No. 2:20-cv-00410-MKD, 2023 WL 6297483, at *10 (E.D. Wash. Sept. 27, 2023) ("To establish liability under Section 1983, there must be a 'direct causal link' between a *Monell* defendant's policy or custom and the plaintiff's constitutional injuries.") (quoting *Sandoval*, 985 F.3d at 681); *see also Bair v. Snohomish Cnty.*, No. 2:19-cv-00998-BJR, 2021 WL 351251, at *9 (W.D. Wash. Feb. 2, 2021) ("It is uncontested that Plaintiff received some level of medical care as she was seen by Nurse Sisawo three times and MHP Burns at least once. The lack of the [Inmate] Handbook, therefore, did not deprive her of medical care.").

Furthermore, as a general matter, there is no constitutional right to see a medical doctor, and "a prison's practice of using nurses, instead of doctors, for primary medical treatment does not constitute a policy or custom that violates the Constitution." *Benge v. Scalzo*, No. 2:04-cv-01687-DGC-CRP, 2008 WL 2157024, at *9 (D. Ariz. May 21, 2008); *see also Mosley v. Thornton*, No. 6:05-cv-00692-RFD, 2005 WL 1645781, at *4 (W.D. La. June 20, 2005) ("[T]he fact that plaintiff was seen and treated by nurses rather than a physician does not implicate the constitution."). Plaintiff also has not produced any evidence that the contractual agreement for medical staffing was the "moving force" behind his injury. As the County contends, and plaintiff concedes, nurse practitioners are "licensed to provide independent patient care and authorized 'for managing health problems,' " which includes " 'diagnosis,' 'management of health care during acute and chronic phases of illness,' and 'prescribing, dispensing, and administration of therapeutic devices and measures, including legend drugs and controlled substances.' " Correct Care Mot. Summ. J. 14, ECF 77 (quoting O.A.R. 851-055-002, 851-055-0020(5); O.R.S. 678.375(4)); Opp. 14 n.68, ECF 85; *see also Besecker v. Loop*, No. 4:21-cv-00112-TWP-KMB, 2023 WL 2587307, at *14 (S.D. Ind. Mar. 20, 2023) (granting summary judgment on plaintiff's

claim that a policy allowing a nurse practitioner to provide inmate medical care was not deliberately indifferent because, among other things, the provider was authorized under state law to prescribe the treatment provided).

Plaintiff also points to "Correct Care's own policies," which are apparently "in line with the National Commission on Correctional health Care" policy, and which provide that a "responsible physician," meaning a "designated MD or DO" with "final authority at a given facility regarding clinical issues" is needed and a "nurse practitioner or physician assistance cannot substitute as the responsible physician." Opp. 39, ECF 85. But even assuming that the staffing at the jail ran afoul of this policy, the violation of an internal policy, or even a provision of state law, does not necessarily equate to a violation of a plaintiff's constitutional rights. *See Caldwell v. City of Irvine*, No. 8:23-cv-01884-FWS-DFM, 2024 WL 2107374, at *3 (C.D. Cal. Mar. 28, 2024) ("As a general rule, a violation of state law does not lead to liability under § 1983[.]") (quoting *Campbell v. Burt*, 141 F.3d 927, 930 (9th Cr. 1998)); *Crowley v. Nevada ex rel. Nevada Sec'y of State*, 678 F.3d 730, 736 (9th Cir. 2012) ("To the extent that the violation of a state law amounts to the deprivation of a state-created interest that reaches beyond that guaranteed by the federal Constitution, Section 1983 offers no redress.").

And there is no evidence connecting the apparent lack of physician oversight to the alleged "failure to diagnose and treat [p]laintiff's hip fracture." Opp. 41, ECF 85; *see also Norman v. Wellpath, LLC*, No. 3:19-cv-02095-MO, 2022 WL 1516262, at *8 (D. Or. May 13, 2022) (granting summary judgment on plaintiff's *Monell* claim based on medical staffing policies because plaintiff "[did not] explain how" staffing a Licensed Practicing Nurse instead of a Registered Nurse contributed to plaintiff's death). The record and briefing suggest that different treatment options were available for someone in plaintiff's condition, but plaintiff does

26 – FINDINGS AND RECOMMENDATIONS

not point to any evidence establishing that the decision to pursue a particular course of treatment was necessarily dictated by whether a physician, and not a nurse practitioner, was involved. As mentioned above, Dr. Baskerville opined that even with negative x-rays, a patient such as plaintiff "who cannot bear weight – let alone ambulate – mandates a CT scan."[36] Dr. Roth opined that "pain despite a negative x-ray is not an absolute indication for a CT scan" and that it was "reasonable to observe an injury such as this with serial imaging (ie follow-up x-rays looking for displacement/callus in 1-2 weeks if pain persists)."[37] Plaintiff asserts that medical staff could have referred plaintiff to a community hospital for additional examination or treatment. *See e.g.*, Opp. 42, ECF 85. But missing is any evidence that the treatment options were limited based the available staff's medical credentialing or that physician oversight would have made any difference in the decision regarding how to diagnose and treat plaintiff's condition. At best, plaintiff's evidence highlights a disagreement about the appropriate course of plaintiff's treatment, but it does not demonstrate the causal link between the availability of physician oversight and the course of treatment that plaintiff received.

As for the second category of *Monell* liability, plaintiff claims that the County had certain customs or practices regarding the treatment of inmates at the jail with "emergency medical conditions." Opp. 38, ECF 85; Second Am. Compl. ¶ 22, ECF 64. But apart from evidence regarding the treatment plaintiff received after his fall, plaintiff has not produced admissible evidence of other similar incidents to create a triable issue on whether the County had an unconstitutional custom or practice in treating inmates with emergency medical conditions. The alleged custom upon which *Monell* liability can be found "must be so 'persistent and

---

[36] Baskerville Report 3, ECF 85-15.
[37] Roth Report 3, ECF 78-11.

widespread' that it constitutes a 'permanent and well settled . . . policy.' " *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (quoting *Monell*, 436 U.S. at 691). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Id.* Thus, evidence of plaintiff's treatment alone is not sufficient to establish that the County had any practice or custom. *See Warren v. Yamhill Cnty.*, No. 3:23-cv-00911-SI, 2024 WL 36788, at *6 (D. Or. Jan. 3, 2024) ("A single incident generally does not support a claim of longstanding custom or practice.") (citing *Saved Mag. v. Spokane Police Dep't*, 19 F.4th 1193, 1201 (9th Cir. 2021) ("Plaintiffs' allegations amount to no more than an isolated or sporadic incident that cannot form the basis of *Monell* liability for an improper custom."); *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999) (stating that a "single constitutional deprivation ordinarily is insufficient to establish a longstanding practice or custom")) (additional citations omitted).

The only other evidence plaintiff points to regarding this alleged custom include three previous lawsuits filed by different plaintiffs in federal court regarding medical care in custody, and two "inmate medical grievances contained in meeting notes received from [the] County" in discovery. Opp. 43–44, ECF 85. At best, these materials establish that other lawsuits or grievances regarding medical care exist; however, "the mere fact that such lawsuits were filed does not support the existence of a policy, custom, or practice" for *Monell* liability. *Gillam v. City of Vallejo*, No. 2:14-cv-02217-KJM-KJN, 2016 WL 4059184, at *7 (E.D. Cal. May 27, 2016), *report and recommendation adopted,* No. 2:14-cv-02217-KJM-KJN, 2016 WL 4041508 (E.D. Cal. July 28, 2016); *Strauss v. City of Chicago*, 760 F.2d 765, 768–69 (7th Cir. 1985) (noting that for *Monell* claims: "[T]he number of complaints filed, without more, indicates

nothing. People may file a complaint for many reasons, or for no reason at all. That they filed complaints does not indicate that the policies that [the plaintiff] alleges exist do in fact exist and did contribute to his injury.").

Even if the allegations in the referenced lawsuits or grievances were true, this evidence still would not create a question of fact as to the alleged custom regarding the County's treatment for inmates experiencing "emergency medical conditions" because they are isolated and sporadic incidents that cannot form the basis of *Monell* liability. According to undisputed evidence from the County, in 2018 (the year during which plaintiff's injury occurred), the "Columbia County jail housed 1,936 inmates who made 15,289 requests for medical services."[38] In 2017, the jail "housed 2,655 inmates and those inmates made 11,933 requests for medical services."[39] The federal lawsuits plaintiff referenced were filed in 2015, 2021, and 2022, and the two grievances were from 2016.[40] *See* Opp. 43, ECF 85 (citing cases). Five incidents over the course of approximately eight years during which presumably several tens of thousands of requests for medical services were made is not indicative of a practice of "sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino*, 99 F.3d at 918; *see also Self*, 2021 WL 2875659 at *12 (finding that plaintiff's *Monell* claim based on Columbia County's alleged custom of "failing or refusing to provide meaningful assistance to inmates who have serious medical needs" was subject to summary judgment because "no rational trier-of-fact would find three incidents out of thousands of requests for medical treatment sufficient to establish a persistent and widespread custom that constitutes a permanent and well settled policy") (simplified); *Arceo v. City of Roseville*, No. 2:20-cv-02334-

---

[38] Pixley Decl. ¶ 13, ECF 80.
[39] *Id.*
[40] Weingart Decl., Ex. BB at 1, ECF 85-28.

DAD-DB, 2024 WL 871463, at *18 (E.D. Cal. Feb. 28, 2024) (finding that three incidents over a nine-year period were insufficient to show a "permanent and well-settled policy of denying adequate health care to persons with serious mental illnesses by confining them in isolation rather than providing them the care they require"); *Alphonsis v. Century Reg'l Det. Facility*, No. 2:17-cv-03650-ODW-DFM, 2021 WL 4691824, at *6 (C.D. Cal. Sept. 8, 2021), *report and recommendation adopted,* 2021 WL 4651388 (C.D. Cal. Oct. 7, 2021) (finding that "four occasions over almost two years" of alleged constitutional violation was insufficient to establish a "persistent and widespread" practice or custom).

Thus, plaintiff's theories of *Monell* liability fail as a matter of law and the County is entitled to summary judgment on plaintiff's fourth claim for relief.

## RECOMMENDATIONS

Defendant Columbia County's Motion for Summary Judgment (ECF 79) should be granted in part and denied in part in that summary judgment should be denied as to plaintiff's state law medical malpractice claim and granted as to all other claims.

## SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge.  Objections, if any, are due Tuesday, January 20, 2026.  If no objections are filed, then the Findings and Recommendations will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendations will go under advisement.

**NOTICE**

These Findings and Recommendations are not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any Notice of Appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of a judgment.

DATED December 29, 2025.


                                                    /s/ Youlee Yim You
                                                    Youlee Yim You
                                                    United States Magistrate Judge